

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-15-00319-CR

MARLENE COOK                                                                 APPELLANT

V.

THE STATE OF TEXAS                                                                 STATE

----------

FROM COUNTY CRIMINAL COURT NO. 5 OF DENTON COUNTY
TRIAL COURT NO. CR-2014-07321-E

----------

## OPINION

----------

Marlene Cook appeals from the trial court's denial of her motion to suppress. We affirm.

## Background

A City of Lewisville police officer arrested appellant without a warrant at her home after responding to 911 calls about a possible drunk driver and performing field sobriety tests on appellant in the parking lot in front of her

building. Appellant's blood was drawn after the arrest. The State filed a complaint and information alleging that appellant had committed the misdemeanor offense of driving while intoxicated and that she had a blood alcohol concentration of 0.15 or more. *See* Tex. Penal Code Ann. § 49.04(a), (d) (West Supp. 2016). Appellant filed a motion to suppress the blood evidence and any statements she made while in custody, in which she contended that she had been detained without reasonable suspicion and arrested without probable cause or a lawful warrant in violation of the Texas and United States Constitutions. After a hearing, at which she also objected that she was arrested in violation of article 14.03 of the code of criminal procedure, the trial court denied her motion to suppress. The trial court also filed findings of fact and conclusions of law in accordance with appellant's request. Appellant then pled nolo contendere to the allegations in the information, the trial court found her guilty of the offense as alleged in the information, and the trial court assessed her punishment at 250 days' confinement and a $500 fine. The trial court suspended her sentence and placed her on community supervision for fifteen months.

## Motion to Suppress

In her first issue, appellant contends that the trial court erred by denying her motion to suppress because, under the totality of the circumstances, (1) there was no probable cause to arrest her and (2) officers did not find her in a suspicious place because there is no evidence of how much time had elapsed between when she arrived home and when she was arrested; therefore, her

2

arrest was not authorized by article 14.03 of the code of criminal procedure. Tex. Code Crim. Proc. Ann. art. 14.03 (West 2015). In her second issue, appellant contends that the officers did not have reasonable suspicion under the Fourth Amendment and article I, section 9 of the Texas Constitution to detain her to perform an investigation.

**Preservation**

The court of criminal appeals has cautioned that our review of motions to suppress is subject to traditional error preservation principles. *Hailey v. State*, 87 S.W.3d 118, 121–22 (Tex. Crim. App. 2002), *cert. denied*, 538 U.S. 1060 (2003). Appellant's written motion to suppress raised only constitutional grounds regarding lack of reasonable suspicion and probable cause. At the hearing on the motion, appellant additionally argued that article 14.03 did not authorize the warrantless arrest because no officer witnessed her committing an offense, the 911 callers' observations could not be considered to be within the collective knowledge of the arresting officer, and there is no evidence of the amount of time that had elapsed between when she arrived home and when she was arrested. Because these were the only objections at trial related to the validity of the arrest under article 14.03—as well as appellant's only arguments on appeal regarding article 14.03—these are the only potential grounds for reversal as to that statute. *See id.*

**Applicable Standard of Review**

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *State v. Kelly*, 204 S.W.3d 808, 818–19 (Tex. Crim. App. 2006). We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

To suppress evidence because of an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Amador*, 221 S.W.3d at 672; *see Young v. State*, 283 S.W.3d 854, 872 (Tex. Crim. App.), *cert. denied*, 558 U.S. 1093 (2009). A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant. *Amador*, 221 S.W.3d at 672. Once the defendant has made this showing, the burden of proof shifts to the State, which is then

4

required to establish that the search or seizure was conducted pursuant to a warrant or was reasonable. *Id.* at 672–73; *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

**Facts Adduced at Motion to Suppress Hearing**

At the motion to suppress hearing, Christy Fitzgerald, a public safety dispatcher with the City of Lewisville, testified that around 9:45 p.m. on the evening of July 19, 2014, she received a 911 call regarding a possibly intoxicated driver. According to Fitzgerald, the caller identified herself, said the car at issue was a silver Hyundai, gave Fitzgerald a license plate number, and said the car had crossed over "about three lanes" and at some point struck a concrete wall. The caller told Fitzgerald that she had followed the driver of the Hyundai until the car "pulled into a garage at some homes . . . located off Rock[b]rook." The caller said the number on the garage was 87. Fitzgerald input this information into the dispatch call notes, and a different dispatcher "relayed the information to the officers."

The trial court listened to the 911 call. The time of the call is recorded as 9:46 p.m. On the recording, the caller identified herself by first and last name, telephone number, and vehicle color and model. She said that she watched a silver Hyundai travel over three lanes on westbound Highway 121 and that it almost hit a concrete barrier. The caller described the direction the Hyundai's driver was traveling. As the caller was speaking to Fitzgerald, she exclaimed that

5

the driver of the Hyundai had run into the center median of the road on which they were traveling. At one point, Fitzgerald indicated that a different caller was also following the Hyundai and had said that it was pulling into some apartments. The initial caller kept describing the location where the Hyundai was headed until the driver pulled onto Rockbrook, into an apartment complex, and from there into garage number 87. The caller never saw the driver of the Hyundai, but she did see the car pull into that particular garage. The caller agreed to wait at the scene until the police could arrive.

Detective Mitchell Colbath with the Lewisville Police Department testified that he was on duty the evening of July 19, 2014, and he was dispatched to a call regarding a possible intoxicated driver at around 9:45 p.m. The dispatcher gave him the location of the call as 2500 Rockbrook Drive. The dispatcher told him that the car involved was a silver Hyundai, gave the license plate number, and said the car was "actually going across several lanes of traffic, back and forth," and that it "almost struck several vehicles and concrete barriers." Detective Colbath met Officer Russell Brininstool at the location on Rockbrook Drive as well as "several witnesses that had called into dispatch."

The witnesses had already told Officer Brininstool that the car was in garage number 87. Because the garages were on the back side of the building and the doors to the homes were in front, Detective Colbath and Officer Brininstool walked around to the front of the apartments and found the front door that had number 87 on it. Appellant answered when they rang the doorbell, but

6

according to Detective Colbath it took her about five to ten minutes to do so. Appellant identified herself when the officers asked her name, and she said she had just arrived home after having been driving. Detective Colbath noticed while he was speaking with appellant that her "eyes were red and watering[,] her speech was slurred[ and] thick tongued, and there was an immediate odor of alcohol when she opened the door" that he could smell when she spoke.

Detective Colbath asked appellant if she drove a silver Hyundai, and she said yes. He then asked appellant to step outside her apartment, and she agreed. After Detective Colbath asked appellant if she had been drinking, she told him she had been at a birthday party and had drunk "several . . . glasses of wine." He also asked her whether she had drunk anything since coming home, and she said no. Detective Colbath had appellant perform standardized field sobriety tests.

The State played a recording from Detective Colbath's in-car camera for the trial court but only of events up to the time he arrested appellant. The DVD is from Detective Colbath's dashcam, but the officers' encounter with appellant at the door can be heard. Detective Colbath can be heard asking appellant if she was the only one at home; although it is difficult to hear her over the sound of a dog barking, appellant can be heard answering, "Yes." She admitted that she just got home and that she drives a silver Hyundai Elantra. She also told the officers that she had come home from a birthday party in Mansfield and that she

7

had had "a little bit to drink," which she later clarified was two or three glasses of wine.

Detective Colbath and appellant can be seen walking to the front of Detective Colbath's car and into the view of the camera. When Detective Colbath asked appellant about her vehicle, she pointed back toward the apartment outside of the view of the camera and said, "It's there." He asked her if she was feeling the effects of the alcohol "right now," and she said yes. She did not remember hitting a curb while driving, but when Detective Colbath asked if she felt intoxicated, she answered, "Yes, I've had a few drinks." Appellant had trouble following Detective Colbath's instructions during the field sobriety tests, and she could not walk in a straight line during the heel-toe test. She also had trouble counting backward, omitting at least one number. Appellant told Detective Colbath she had not had anything to drink since arriving home.

On cross-examination, Detective Colbath confirmed that he was not sure how long appellant had been home before he contacted her. He did not verify whether a silver Hyundai was located in garage 87, so he likewise had not verified whether a car that might have been in the garage had any damage to it or whether it was still warm. Additionally, the witnesses at the scene never described the physical appearance of the driver of the car. The information available to him when he contacted appellant was that witnesses had watched a silver Hyundai driving erratically and that they had also watched that same car being driven into garage number 87. Detective Colbath also testified that it

8

appeared appellant would have had time to change clothes after coming home from the party.

According to Detective Colbath, appellant was detained at the time she answered the door for him and Officer Brininstool, and he had reasonable suspicion to detain her for the offense of driving while intoxicated at that time. He believed that after the initial contact he also had probable cause to arrest appellant because "she had admitted that she was driving[ and] that she drove the Hyundai, . . . she had red, watery eyes, slurred speech, and an odor of alcohol," and she had told the officers that she was the only one home.

Officer Brininstool described the driving facts he had been told as, according to witnesses, "the vehicle was all over the roadway." He said the address where the vehicle stopped was given by two separate witnesses.[1] He arrived at the location first and made contact with four witnesses who were parked "out back of the garage that the vehicle pulled into." The witnesses confirmed that the car had parked in that garage, which was numbered 87.

Officer Brininstool testified similarly to Detective Colbath regarding the encounter with appellant. According to Officer Brininstool, appellant told them that she had just arrived home after driving home from a birthday party in Mansfield. He believed Detective Colbath had asked her what type of vehicle she drove and the color, and he confirmed that it corresponded with the 911

---

[1]In addition to the two callers, at least one of the callers had a passenger in her car.

9

caller's description. Officer Brininstool described appellant as "having a hard time keeping her balance," speaking with a "very thick tongue," and "kind of" mumbling. After appellant went into the parking lot with Detective Colbath, Officer Brininstool left them to take statements from the witnesses; when he was done, he stayed around the scene, making sure it was safe.

Officer Brininstool confirmed that he and Detective Colbath did not have any description of the driver and that witnesses did not tell him they saw the driver. He did say, though, that he had seen the townhomes in which unit 87 was located when they were being built, and the garages are directly behind the dwellings corresponding to the same number. Officer Brininstool did not believe appellant was detained when she opened the front door; rather, he believed that there was reasonable suspicion to detain appellant once he and Detective Colbath had confirmed that she had been the driver of the car and saw signs that she was intoxicated. He did not think there was probable cause to arrest appellant until after she had completed the field sobriety tests.

In closing, appellant argued that (1) there is no evidence regarding what dispatch told the officers, (2) at least one of the officers understood there was an allegation of "weaving," (3) there is an issue regarding the timing of the arrest under article 14.03,[2] specifically, that the officer did not see an offense in his

---

[2]Appellant never challenged the constitutionality of article 14.03(a)(1); therefore, we do not address it on appeal. *See Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009); *Curry v. State*, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995).

presence and there are not enough facts to show that appellant was in a suspicious place, (4) the officers never inspected the Hyundai to see if the driving facts given by the witnesses could be corroborated, (5) Detective Colbath could not have had reasonable suspicion to detain appellant when she answered the door because all he knew was that she was answering the door to a townhome, and (6) Detective Colbath did not have probable cause to make a warrantless arrest.

### Findings of Fact and Conclusions of Law

The trial court made extensive findings of fact and conclusions of law.  It found that all of the witnesses were credible.  It also found that Fitzgerald received the 911 call "around 9:48 p.m. on July 19, 2014," that the 911 caller identified herself and said she was following a silver Hyundai that she identified by license plate number, that the caller "followed the subject vehicle without losing sight of the vehicle throughout the duration of the call to 911," and that the caller described the subject's driving as "weaving, almost hit[ting] a concrete barrier, and . . . hit[ting] a median."  The trial court further found that the same caller told Fitzgerald that she saw the vehicle enter garage number 87 at 2500 Rockbrook Drive, that she stayed at the townhome until the Lewisville officers arrived within ten minutes, and that the vehicle never left the garage.  The trial court additionally found that "Fitzgerald relayed all the information she received from [the caller] to a dispatcher, who then relayed the information to the responding officers."

11

The trial court further found that Detective Colbath was dispatched around 9:48 p.m. on July 19, 2014, that the dispatcher notified him while he was en route to the call location that several witnesses had called 911, and that the vehicle was a silver Hyundai with the same license plate number reported by the 911 caller. The trial court found that "Detective Colbath testified that he was informed via dispatch that the 911 callers followed defendant to the townhomes at 2500 Rockbrook Drive, Lewisville, Texas." It also found that "Detective Colbath testified that approximately 5 to 10 minutes elapsed between the time he was dispatched to the call location and the time he arrived at the scene. Detective Colbath further testified that he spoke with Officer Brininstool for less than a minute." The trial court made the following additional findings relevant to appellant's interaction with Detective Colbath:

20. Detective Colbath testified that he was able to locate garage number 87 and was able to locate the corresponding residence, demarcated as townhome number 87.

21. Detective Colbath testified that once he located townhome 87 he knocked on the door and made contact with a female.

22. Detective Colbath testified that the female identified herself as [appellant]. [Appellant] then confirmed that she owns a silver Hyundai Elantra. She also confirmed that she had driven the Elantra this evening and had recently arrived at her home.

23. Detective Colbath testified that [appellant] said she was the only person in the residence at that time.

24. Detective Colbath testified that [appellant] advised she had driven home from a birthday party in Mansfield and that she had 2 to 3 glasses of wine at the birthday party. Detective Colbath further

12

testified that [appellant] advised she had not had anything to drink since arriving at her home.

25. Detective Colbath testified that after [appellant] confirmed that she was the driver and owner of the silver Hyundai Elantra and had recently arrived home, he asked her to come outside so he could further investigate.

26. Detective Colbath testified that he observed [appellant] and noticed watery red eyes, slurred thick [tongued] speech and an immediate odor of alcohol when [appellant] spoke.

27. Detective Colbath testified that once [appellant] joined him outside, he requested her to perform the Standardized Field Sobri[e]ty Test battery, to which she complied.

28. Detective Colbath testified that [appellant] had difficulty walking and almost fell while walking.

29. Detective Colbath testified that once he concluded his investigation, he had probable cause to believe that [appellant] had committed the offense of Driving While Intoxicated and he then placed [appellant] under arrest.

The trial court made other findings pertinent to Officer Brininstool:

32. Officer Brininstool testified that he was dispatched to a call for an intoxicated driver around 9:48 p.m. on July 19, 2014.

33. Officer Brininstool testified that while en route to the call location, he was notified that there were several witnesses who called 911, that the subject vehicle was a silver Hyundai Elantra, and he was given the Elantra's license plate number . . . .

34. Officer Brininstool testified that he was the first officer to arrive at the call location of 2500 Rockbrook Dr, #87, Lewisville, Denton County, Texas.

35. Officer Brininstool testified that once on scene, he spoke with the witnesses, including [the 911 caller], that had called 911 to report the possible intoxicated driver.

13

36. The witnesses saw the subject vehicle enter garage number 87.

37. Officer Brininstool testified that he was able to locate garage number 87 and he further testified that he had seen these particular townhomes being built thus he knew townhome residence number 87 was attached to garage 87 and as an added measure of accuracy, he counted the townhome doors to match the corresponding garage numbers before knocking on [appellant's] door.

38. Officer Brininstool testified that he was present when Detective Colbath knocked on the door of residence number 87 and made contact with the female that answered the door.

39. Officer Brininstool testified that he did not believe [appellant] to be detained at the time she opened the door.

40. Officer Brininstool testified that the female identified herself as [appellant] and she advised she owned a silver Hyundai Elantra, had driven that car on this specific evening, and had recently arrived home.

41. Officer Brininstool testified that [appellant] then accompanied Detective Colbath outside upon his request.

42. Officer Brininstool testified that once [appellant] was outside with Detective Colbath, he was not the investigating officer and his primary duty was that of a back-up officer and scene security. Officer Brininstool further testified he did not perform the Standardized Field Sobriety Tests and did not participate in the decision to arrest [appellant].

43. Officer Brininstool testified that he took statements from the 911 callers.

The trial court made the following conclusions of law:

1. The Defendant's Motion to Suppress challenges Detective Colbath's reasonable suspicion to detain [appellant] and Detective's Co[l]bath's ability to arrest [appellant] pursuant to Texas Code of Criminal Procedure Art. 14.03, without a warrant.

14

2. Any officer may arrest, without [a] warrant, persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony, in violation of Title 9, Chapter 42, Penal Code, breach of the peace, or offense under Section 49.02, Penal Code, or threaten, or about to commit some offense against the laws. Texas Code of Criminal Proc. Art. 14.03 (a)(1).

3. Detective Colbath was investigating the offense of driving while intoxicated when he knocked on the front door of townhouse #87. Driving while intoxicated is a breach of the peace. *Romo v. State*, 577 S.W.2d 251, 253 (Tex. Crim. App. 1979).

4. The Court agrees with Officer Brininstool, not Detective Colbath. At the moment [appellant] answered the door, there was not reasonable suspicion to detain [appellant].

5. When [appellant] voluntarily opened the door, Detective Colbath observed [appellant] and noticed red watery eyes, slurred, thick [tongued] speech and an immediate odor of alcohol when the defendant spoke. These factors coupled with [appellant's] inculpatory voluntary statements of being the only person inside the townhouse, that she had recently arrived home and that she had been driving the suspected car gave Detective Colbath reasonable suspicion to detain [appellant] and continue his investigation of [appellant] for the offense of driving while intoxicated.

6. An officer may stop and briefly detain a citizen for investigative purposes if the officer, in light of his experience, has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. Woods v. State, 970 S.W.2d[] 770, 773 (Tex. App.—Austin 1998, pet. ref'd).

7. "Reasonable suspicion" exists if an officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonabl[y] suspect that a particular person has engaged, is engaged, or soon will be engaging in criminal activity. The reasonable suspicion determination is made by considering the totality of the circumstances. Garcia v. State, 43 S.W[.]3d 527, 530 (Tex. Crim. App. 2001).

8. The detaining officer does not have to be personally aware of every fact that is taken into account during the reasonable

15

suspicion calculation, but it is the cumulative information known to detaining officer and other cooperating officers at the time of the detention. 911 dispatchers and call takers are considered cooperating officers for purposes of the reasonable suspicion calculation. *Derichsweiler v. State,* 348 S.W.3d 906, 914 (Tex. Crim. App. 2011).

9. [Appellant] voluntarily submitted to the standardized field sobriety tests (SFST) battery for Detective Colbath.

10. The additional evidence Detective Colbath discovered during the administration of the SFST, coupled with the information from Officer Brininstool and the civilian witnesses rose to the level of probable cause to arrest [appellant] for the offense of driving while intoxicated.

11. Any determination of whether a place is a suspicious place for purposes of Art. 14.03(a)(1) is fact specific, but one factor consistently considered by the Texas Court of Criminal Appeals is the time between the crime and the apprehension of the suspect in a suspicious place. *Buchanan v. State*, 175 S.W.3d 868, 875-76 (Tex. App.—Texarkana 2005), *rev'd on other grounds,* 207 S.W.3d 772 (Tex. Crim. App. 2006).

12. [Appellant's] townhouse became a suspicious place once the suspect car parked in the attached garage. There was a short duration of time between the time the car parked in the attached garage and the time the officers knocked on the door. This short duration of time (approximately 15 minutes) was not enough time to remove the suspicion from the townhouse. *Dyar v. State*, 125 S.W.3d 460, 468 (Tex. Crim. App. 2003).

13. Since Detective Colbath had probable cause to arrest [appellant] for a breach of the peace and Detective Colbath found [appellant] in a suspicious place, Detective Colbath was acting within his constitutional and statutory power to arrest [appellant]. Texas Code of Criminal Proc. Art. 14.03 (a)(1).

**Analysis**

Appellant challenges whether the officers had reasonable suspicion to detain her to investigate a possible drunk driving offense and also whether her

16

arrest was authorized under article 14.03. Because the chronology of events is important, we will review her issues together, but we address reasonable suspicion first.

**Reasonable Suspicion**

Officers had been dispatched to the townhomes based on information given to the police by 911 callers. Appellant voluntarily answered her door in response to their knock. *See Cornealius v. State*, 900 S.W.2d 731, 733–34 (Tex. Crim. App. 1995) (noting that nothing in United States or Texas constitutions prohibits officer from knocking politely on closed door). In determining whether the totality of the circumstances, viewed objectively, provide a justifiable basis for detention, we consider the cumulative information known to the cooperating officers at the time of the stop rather than whether those officers are "personally aware of every fact that objectively supports a reasonable suspicion to detain." *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011), *cert. denied*, 132 S. Ct. 150 (2011). Information provided to police from a citizen-informant who identifies herself and may be held to account for the accuracy and veracity of her report may be regarded as reliable. *Id.* at 914–15. The court of criminal appeals has held that in such a scenario, the only question is whether the information that the known citizen-informant provides, viewed through the prism of the detaining officer's particular level of knowledge and experience, objectively supports a reasonable suspicion to believe that criminal activity is afoot. *Id.* at 915.

As in *Derichsweiler*, there is no issue in this case with respect to the reliability of the citizen-informant because she identified herself and, along with at least one passenger, stayed at the scene to give witness statements to the police. *See id.* at 915. Here, the collective information known to the police as provided by the citizen-informant to the 911 dispatcher, appellant's condition as further witnessed by the officers, and her statements to them when she answered the door and voluntarily spoke to them—the facts specifically listed in the trial court's conclusion number 5—were sufficient to give the officers reasonable suspicion to detain appellant to further investigate whether probable cause existed to arrest her for the offense of driving while intoxicated. *See Dunkelberg v. State*, 276 S.W.3d 503, 504–06 (Tex. App.—Fort Worth 2008, pet. ref'd); *Ortiz v. State*, 930 S.W.2d 849, 856 (Tex. App.—Tyler 1996, no pet.). Accordingly, we overrule appellant's second issue.

**Validity of Warrantless Arrest**

Appellant further argues that the totality of the circumstances do not show that Detective Colbath had probable cause to arrest her or that she was located in a suspicious place. *See* Tex. Code Crim. Proc. Ann. art. 14.03(a)(1).

Under the Fourth Amendment, a warrantless arrest is generally unreasonable per se unless the arrest fits into one of a "few specifically defined and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S. Ct. 2130, 2135 (1993); *Torres v. State*, 182 S.W.3d 899, 901 (Tex. Crim. App. 2005). "A police officer may arrest an individual without a warrant only if

18

probable cause exists with respect to the individual in question *and* the arrest falls within one of the exceptions set out in Tex. Code Crim. Proc. art. 14.01– 14.04." *Torres*, 182 S.W.3d at 901 (emphasis added); *see* Tex. Code Crim. Proc. Ann. arts. 14.01–.04 (West 2015 & Supp. 2016). The requirement that an arrest must be in accordance with article 14 as well as be supported by probable cause affords a heightened level of protection under Texas law than under the Fourth Amendment. *E.g.*, *Milton v. State*, 549 S.W.2d 190, 192 (Tex. Crim. App. 1977).

**Probable Cause**

Probable cause for a warrantless arrest requires that the officer have a reasonable belief that—based on facts and circumstances within the officer's personal knowledge, or of which the officer has reasonably trustworthy information—an offense has been committed. *Torres*, 182 S.W.3d at 901–02. Probable cause must be based on specific, articulable facts rather than the officer's mere opinion. *Id.* at 902. We use the "totality of the circumstances" test to determine whether probable cause existed for a warrantless arrest. *Id.*

Appellant points out that no witnesses identified her as the driver of the silver Hyundai, that officers did not conduct any investigation regarding any other cars that might have been in the garage, that Detective Colbath did not ask her what kind of car she had driven that night,[3] that officers did not obtain any

---

[3]Appellant argues that the video of the field sobriety tests "clearly contradicts the statements provided by [Detective] Colbath that [she] admitted

evidence that would affirmatively link her to the vehicle that had been driven into garage number 87, and that there is no evidence linking her to the license plate number of the vehicle that the witnesses saw. But although whether some facts are absent may be considered in making a probable-cause determination, the absence of those facts must nevertheless be considered along with the totality of the facts available. *See Parker v. State*, 206 S.W.3d 593, 601 (Tex. Crim. App. 2006); *State v. Garrett*, 22 S.W.3d 650, 655 (Tex. App.—Austin 2000, no pet.); *State v. Long*, No. 03-11-00725-CR, 2012 WL 1959316, at \*6 & n.7 (Tex. App.—Austin May 31, 2012, no pet.) (mem. op., not designated for publication) (noting that cases describing standard of review hold that "probable-cause determination is based on the totality of the facts and circumstances in each case, and the absence or presence of any particular fact or circumstance is not dispositive").

Like reasonable suspicion, probable cause is also subject to the collective knowledge doctrine. *See U.S. v. Powell*, 732 F.3d 361, 369, 372 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1326 (2014); *State v. Duran*, 396 S.W.3d 563, 569 n.12

---

that she was driving any vehicle on the day of her arrest" and that "[t]he officer's question can be interpreted as what vehicle she normally drives rather tha[n] what vehicle she drove home that evening (if any)." However, considering the totality of the circumstances, it is reasonable to infer that appellant had been driving the silver Hyundai when she admitted that she drove a silver Hyundai, she had been driving home from a party, witnesses had followed a silver Hyundai to her apartment complex, and one of the officers knew that the garages for the apartments were behind the units. *See State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011) ("[C]ourts afford the prevailing party 'the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.'").

(Tex. Crim. App. 2013). The trial court found that probable cause to arrest appellant for driving while intoxicated arose after Detective Colbath administered the field sobriety tests and Officer Brininstool interviewed the 911 callers and other civilian witnesses. We agree. *See LeCourias v. State*, 341 S.W.3d 483, 489–90 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *see also Smith v. State*, 491 S.W.3d 864, 868–72 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (concluding that police had probable cause to arrest Smith without a warrant in hospital waiting room in accordance with "'family violence' exception" to article 14.03 after interviewing complainant who told them that Smith was her boyfriend and had "stabbed and then also stomped on" her at home). Accordingly, we conclude and hold that appellant's failure of the field sobriety tests, coupled with the information giving rise to reasonable suspicion to detain her, gave Detective Colbath probable cause to arrest her.

**Suspicious Place**

Code of criminal procedure article 14.03(a)(1) provides that "[a]ny peace officer may arrest, without warrant: (1) persons found in suspicious places and under circumstances which reasonably show that such persons *have been guilty of some . . . breach of the peace*." Tex. Code Crim. Proc. Ann. art. 14.03(a)(1) (emphasis added). For purposes of this section, driving while intoxicated is an offense that constitutes a breach of the peace. *Gallups v. State*, 151 S.W.3d 196, 201 (Tex. Crim. App. 2004) (citing *Romo v. State*, 577 S.W.2d 251, 253 (Tex. Crim. App. [Panel Op.] 1979)). "[F]ew, if any places are suspicious in and

of themselves. Rather, additional facts available to an officer plus reasonable inferences from those facts in relation to a particular place may arouse justifiable suspicion." *Dyar v.* State, 125 S.W.3d 460, 464–65 (Tex. Crim. App. 2003) (quoting *Johnson v. State*, 722 S.W.2d 417, 421 (Tex. Crim. App. 1986) (op. on reh'g), *overruled on other grounds by McKenna v. State*, 780 S.W.2d 797, 800 (Tex. Crim. App. 1989)). "Any 'place' may become suspicious when a person at that location and the accompanying circumstances raise a reasonable belief that the person has committed a crime and exigent circumstances call for immediate action or detention by police."[4] *Swain v. State*, 181 S.W.3d 359, 366 (Tex. Crim. App. 2005), *cert. denied*, 549 U.S. 861 (2006).

Whether a place is suspicious so as to justify a warrantless arrest under article 14.03(a)(1) is a highly fact-specific analysis. *Dyar*, 125 S.W.3d at 468. Although cases discuss different factors in determining whether a place may be "suspicious" under the statute, "only one factor seems to be constant throughout the case law. The time frame between the crime and the apprehension of a suspect in a suspicious place is short." *Id.* Courts have held homes to be suspicious places when an eyewitness to a suspected crime or breach of the peace followed a suspect to the home afterwards. *See Crowley v. State*, 842 S.W.2d 701, 703 (Tex. App.—Houston [1st Dist.]), *pet. ref'd as improvidently granted*, 830 S.W.2d 613 (1992) (holding that garage was suspicious place when

---

[4]Appellant has not challenged whether exigent circumstances existed.

driver of other vehicle involved in traffic accident with Crowley—from which she fled—followed her to a detached garage at a private residence and left his passenger to watch the home while he left to call the police); *Freeman v. State*, No. 05-96-00418-CR, 1997 WL 433781, at *2 (Tex. App.—Dallas Aug. 4, 1997, pet. ref'd) (not designated for publication) (holding that Freeman's apartment was suspicious place when witnesses told officers they saw her driving carelessly, leaving the scene of an accident, and stumbling to her apartment and witness watched apartment until officers arrived to ensure Freeman did not leave).

As to whether her apartment could be considered a suspicious place, appellant contends that there is no concrete evidence of how much time had elapsed between the 911 call, the dispatch of the officers to the scene, and her subsequent arrest. She claims that no evidence supports the trial court's finding that only fifteen minutes had elapsed between the time the officers were dispatched and the time they spoke to her at her front door. According to appellant, too much time had elapsed for officers to conclude that she had recently been driving the car.

In *Banda v. State*, another case involving a possible drunk driver found at his or her home based on police investigation of information from identified, eyewitness 911 callers, the court of appeals held that the short amount of time between Banda's arrival at his home and the police officer's arrival—about ten minutes—supported the conclusion that Banda was in a suspicious place. 317 S.W.3d 903, 912 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *see also*

23

*Garcia v. Cockrell*, No. CIV.A.301CV2261M, 2002 WL 1398550, at *1, 3–4 (N.D. Tex. June 25, 2002, order) (adopting findings of magistrate, among them that police had authority to arrest appellant under article 14.03(a)(1) when he was found at home of murder suspect for whom police had warrant and appellant admitted owning Lexus parked in front of home, which police had linked to the murders); *Dyar*, 125 S.W.3d at 468 (concluding that hospital where Dyar had been taken after one-person rollover accident was suspicious place when, while talking to Dyar at hospital, DPS trooper saw intoxication clues and Dyar admitted he had been drinking and driving). Here, the evidence shows that one of the 911 calls began at 9:46 p.m., that the caller told the 911 dispatcher that the person had pulled into a garage around 9:49 p.m., that the 911 dispatcher told the caller to stay at the scene, that Detective Colbath's dashcam showed that he knocked on appellant's door around 9:57 p.m., and that appellant answered about a minute to a minute and a half later. We conclude and hold that on these specific facts, the trial court did not err by determining that appellant's home was a suspicious place for purposes of article 14.03(a)(1). Because we have also concluded that the totality of the circumstances support probable cause, we hold that the trial court did not abuse its discretion by determining that the warrantless arrest was legal.

We overrule appellant's first issue.

24

## Conclusion

Having overruled appellant's two issues, we affirm the trial court's judgment.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DAUPHINOT, J., filed a dissenting opinion.

GARDNER, J., concurs without opinion.

PUBLISH

DELIVERED:  November 10, 2016